# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 18, 2012

## STATE OF TENNESSEE v. CHARMON D. COPELAND

**Appeal from the Criminal Court for Davidson County**
**No. 2010-A-686      Cheryl A. Blackburn, Judge**

---

**No. M2011-01844-CCA-R3-CD - Filed December 21, 2012**

---

The Defendant, Charmon D. Copeland, was convicted by a Davidson County Criminal Court jury of especially aggravated kidnapping, a Class A felony. See T.C.A. § 39-13-305 (2010). He was sentenced as a Range I, standard offender to twenty-five years' confinement at 100% service as a violent offender. On appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction, (2) the prosecutor engaged in three instances of improper conduct, and (3) the trial court improperly sentenced him. We affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE, and D. KELLY THOMAS, JR., JJ., joined.

Elaine Heard, Nashville, Tennessee, for the appellant, Charmon D. Copeland.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Chris Buford and Stacey Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to a physical attack that resulted in multiple stab wounds and lacerations to the victim. The victim testified that she was the Defendant's former girlfriend and that although they were no longer dating, the Defendant visited her from Chicago in early December 2009 and stayed with her mother during his visit. She denied inviting the Defendant to visit her and denied knowing why the Defendant came to Nashville. She said that on December 7, 2009, her mother asked her to drive the Defendant to the bus station early the next morning. She said she arrived at her mother's home around 7:00 or 8:00 p.m.,

picked up the Defendant, and took him to her apartment located on Public Storage's property, where she was employed as a property manager.

The victim testified that she and the Defendant did not talk much during the drive to her apartment and that after they arrived, they discussed the departure time for the Defendant's bus and decided they needed to wake at 2:00 a.m. She said they slept in separate bedrooms. She said she did not talk to the Defendant about reconciling and denied having sexual relations with him. She said she went to sleep around 10:00 p.m. and awoke at 2:00 a.m. She said she got dressed, woke the Defendant, went into the dining area, and sat at the kitchen table. She stated that the Defendant was in the kitchen, that he asked if they were going to reconcile, and that she said, "No." She stated that the Defendant said her mother asked her to call and that as she attempted to unlock her cell phone, the Defendant "struck" her in the head with a thick glass bottle. She denied seeing any blood at that time.

The victim testified that after the Defendant hit her with the bottle, she stood up and that the Defendant struck her again with a vase about one foot tall. Because she was dazed, she did not recall the Defendant's stating anything to her. She said she fell to the floor and heard the Defendant talking, although she could not recall what he said. She said she was stabbed in the back at least twice. She stated that she felt pain and tried to get away from the Defendant but that the Defendant prevented her from doing so. She said the Defendant told her that if he could not have her, nobody could have her and that he would rather see her dead than with someone else. She said the Defendant took her phone. Although she had a second phone in her jacket pocket, she said she could not call for help because she was dazed and because the Defendant stood over her while he stabbed her.

The victim testified that after the Defendant stabbed her in the back, he walked to the kitchen sink, ran water, returned to her, and struck her in the head with a fourteen-inch bowl from the kitchen table. She said the Defendant stabbed her in the back and stomach four or five more times and said, "[D]ie b---- die." She said that before the Defendant stabbed her in the stomach, she told him she was pregnant in an attempt to persuade the Defendant to stop. She said the Defendant responded that the child was not his and continued stabbing her. She said the Defendant stabbed her on the lower left side of her stomach and agreed she received seven stab wounds.

The victim testified that after the Defendant stabbed her in the stomach, the Defendant took items from a nearby bookshelf and hit her with them, including a twelve- to fifteen-inch angel statuette. She said she was unable to move after being hit with the statuette. She said she was able to cover her face with her right hand when the Defendant approached her face with a fillet knife. She said that the Defendant cut her right hand and that he said, "[D]ie b----, die b----, why you not dead yet . . . hurry up and die." She said the Defendant tried to clean

her blood from the floor with bleach. She said that she kept bleach under the sink and in the laundry room and that the Defendant was familiar with her apartment.

The victim testified that she asked the Defendant to call an ambulance and her mother, that the Defendant called the bus station instead, and that the Defendant called his aunt and admitted to killing the victim. She said that she tried unsuccessfully to make noise to let his aunt know she was alive. She said that after the Defendant hung up the phone, he said, "[I]t's self defense, right, it's self defense." The Defendant continued to clean the blood and told her that he was going to put her in the bathtub. She said, though, the Defendant began stabbing her in the breast and chest area. She said the Defendant stabbed her about ten times. She said the Defendant made another phone call, although she did not know whom he called. She said that the Defendant removed all her clothing and that she had a box cutter she used at work in her jacket pocket.

The victim testified that as she lay on the floor bleeding, the Defendant's aunt called. The victim said the Defendant told his aunt that he had left the victim's home and that he heard sirens. She said the Defendant called his father and told him she was dead. She said that the Defendant became angry because she was still alive and that he stabbed her twice in the collar bone and neck with a box cutter. She said that although the Defendant said he was going to put her in the bathtub, she asked the Defendant to put her in bed to die. She said she expected to die. The Defendant helped her into bed and continued cleaning. She said that when her alarm clock rang at 7:25 a.m., the Defendant became nervous.

The victim testified that she asked the Defendant to call for help and told him she was in pain and that the Defendant put two pills, which she believed were Lortab, in her mouth and gave her water. She said the Defendant left the room and returned at 7:40 a.m. when her second alarm rang. She asked the Defendant to call her mother because she was coughing "foam and blood" and believed she was dying. She said the Defendant began a countdown and said, "[I]t's 7:50, it's 7:53, it's 7:54, 7:56." She said the Defendant called her mother and then 9-1-1 at 8:00 a.m. She said the paramedics arrived as she told her mother goodbye. She identified various photographs of the inside of her apartment, including broken glass, an area rug stained with blood, the Defendant's clothes, a bottle of bleach, three knives used during the attack, a bath sponge and cleaning wipes with blood, her bed covered in blood, an angel statuette, and a bowl. She denied being able to defend herself.

The victim testified that the tendons in her right hand were cut and that she required surgery to repair the tendons. She said that as a result of the injuries to her hand, she could not lift more than three pounds. She said that she was right-handed and that it was painful to write. She identified photographs of her wounds taken on December 8, 2009, at

Vanderbilt Hospital and photographs taken three weeks later. She identified a photograph of a cut on her face and said she had a scar from the wound. She said some of her wounds could not be closed because she did not receive prompt medical treatment. She said her lung was punctured, which caused pneumonia, and her kidney and bladder were pierced. The wounds to her chest and breast area required six staples. The wounds to her head also required staples. She identified a photograph of five stab wounds to her back and said her back hurt daily. She said she was hospitalized for seven to ten days.

On cross-examination, the victim testified that she and the Defendant dated for about seven to eight months and that their relationship began in Chicago and continued when they moved to Nashville. She said that the Defendant called her constantly after they ended their relationship and that she responded to his calls and text messages periodically. She denied encouraging the Defendant. She believed the Defendant arrived from Chicago two days before the attack. She said that although she did not know the Defendant was coming to Nashville, her mother knew of his plans. She agreed it was unusual that the Defendant told her mother about his visit and stayed with her mother while in Nashville.

The victim testified that although she did not want to take the Defendant to the bus station, she picked him up because her mother asked. She said that the Defendant removed her clothes between 3:00 and 4:00 a.m., that the Defendant had one of her cell phones, that the other cell phone was in her jacket pocket, and that she could not get to the phone. She said that while she still had on her clothes, she tried reaching for the phone in her jacket pocket, that the pocket was zipped, and that she fought for her life. She said the Defendant put the cell phone to her ear when he called her mother.

The victim testified that the Defendant flew into a rage when she told him their relationship was over. She did not recall losing consciousness, although she recalled being dazed. She said the doctors told her that although her scalp split open, she did not have a skull fracture. She said the Defendant dragged her around her apartment during the attack. She said she weighed about 243 pounds at the time of the attack and was 5'2" tall. She said the Defendant weighed about 180 pounds.

Teresa Walker-Carr testified that she was the victim's mother and that the victim and the Defendant were not dating in December 2009. She said that the Defendant came to Nashville for a doctor's appointment that was scheduled before he left for Chicago and that the Defendant had to go to the local Social Security office. She said the victim did not invite the Defendant to Nashville. She said that when the victim learned of the Defendant's visit, she asked if the Defendant could stay with Ms. Walker-Carr. She said the victim did not want anything to do with the Defendant but did not want the Defendant to miss his appointment. She said the Defendant arrived in Nashville three or four days before the

attack. She said she asked the victim to pick up the Defendant and take him to the bus station the next morning. She stated that a romantic relationship could not have occurred between the Defendant and the victim because the Defendant stayed at her home and that she took the Defendant to his doctor's appointment. She said she did not have a particularly good relationship with the Defendant.

Ms. Walker-Carr testified that after the victim picked up the Defendant, she next spoke to the victim when she called to say goodbye and that she was dying. She said the victim sounded weak. She said the victim stated that the Defendant tried to kill her. At the hospital, she saw the victim had wounds from her head to her knees.

On cross-examination, Ms. Walker-Carr testified that although she did not like the Defendant, she allowed the Defendant to stay at her home because she was a nice person. She agreed she did not call 9-1-1 when the victim called to say she was dying. She said she called her youngest daughter to pick her up because she was not able to drive. She said she told her youngest daughter to call 9-1-1.

Metropolitan Police Officer Michael Johnson testified that on December 8, 2009, he was the first responder to the victim's apartment and that he saw the Defendant talking on the phone when he arrived. He said the Defendant was standing in the doorway and came outside to meet him. He said that he asked the Defendant what happened and that the Defendant responded that the victim stabbed him first. He said he noticed a cut on the Defendant's wrist. He found the victim lying in bed and saw a cell phone near her head. The victim said she was "cut all over." The Defendant told him the knife was in the sink. He took the Defendant into custody. He said the Defendant's only statement at the time was "I guess it's murder, huh."

Officer Johnson testified that the Defendant needed medical treatment for his wounds and that he took the Defendant to the hospital. He overheard the Defendant telling an attendant that the victim stabbed him, that he stabbed the victim, and that his rage made him stab the victim multiple times. He said that the Defendant was calm when he arrived, motioned for him to follow the Defendant after entering the home, and was calm when they entered the victim's bedroom. On cross-examination, Officer Johnson testified that the Defendant was calm, spoke normally, and was not fidgety or nervous. He denied entering the kitchen while inside the victim's apartment.

Metropolitan Police Sergeant Tony Blackburn testified that he arrived at the scene after the ambulance took the victim to the hospital. He said that he smelled bleach when he entered the victim's apartment and that the apartment was "very clean." He saw blood on a broom handle and the kitchen sink. He said he saw "glass glitter," or fine glass shards, on

the floor. He said he found bloody clothing and broken glass in a trash can and blood in various places throughout the apartment.

Sergeant Blackburn testified that he went to the hospital to observe Detective Fisher interview the victim. He said that the victim was surprisingly coherent and that the victim's testimony was similar to the statement she gave Detective Fisher. He returned to the scene and said the officers who processed the scene for evidence found blood on the floor. He said he found "fresh" gouge marks caused by a knife or sharp object on the linoleum floor near the blood. He said the victim told Detective Fisher that she played dead while the Defendant used the bleach and that the Defendant cut himself to establish self-defense.

On cross-examination, Sergeant Blackburn testified that the victim was not sedated and did not appear heavily medicated when he and Detective Fisher talked to her at the hospital. He said the officers at the scene walked carefully inside the victim's apartment based on police training, although he did not know if the paramedics did the same.

Metropolitan Police Sergeant Arnold Rickert testified that he and Detective Sharraff Mallery responded to the victim's apartment on December 8, 2009, and that five to eight officers were already at the scene. He noticed a strong odor of bleach when he entered the victim's apartment and saw a bleach bottle on the kitchen table. He found reddish brown spots around the kitchen sink, on the floor, on a mop handle, and on the broom. He said he saw the same reddish brown spots on a trash can, though the spots were underneath the clear trash bag. He said that he saw "swirls" in the living room flooring that looked like mop or broom markings and that he found broken glass on an area rug. He found three trash cans outside the victim's apartment, which were only accessible from inside the victim's apartment because of a concrete wall surrounding the area. He said he found an empty bleach bottle, bloody clothing, and broken glass inside one of the trash cans.

Metropolitan Police Officer Johnny Lawrence testified that he responded to the victim's apartment on December 8, 2009, and that he helped process the crime scene. He found blood throughout the apartment, including the kitchen sink and counters, the bathroom sink and tub, and the living room floor. He said it looked as though someone tried to clean the kitchen sink and pantry. He said he saw "swipe marks" on the floor as though someone swept the floor with a broom or mop. He said that he collected a black bra found in the trash can outside the victim's apartment and that there were small cuts in the cup areas and on the side. He found a jacket with box cutters and a cell phone in the pockets in the trash can.

On cross-examination, Officer Lawrence testified that he recalled four other officers being at the scene when he arrived and that the paramedics had already taken the victim to the hospital. He agreed there was a significant amount of blood at the scene. He agreed it

was possible that blood was transferred to surfaces because of emergency personnel. He did not see other officers wearing booties on their shoes. He said he wore booties over his shoes while collecting evidence. Although he said he wore gloves, he did not recall if the other officers wore gloves. He denied seeing anyone handle anything inside the victim's apartment without gloves.

John Reynolds testified that he worked as a dispatcher for Metropolitan Emergency Communications and that he received 9-1-1 calls. He identified a recording of the 9-1-1 call made in this case, which was played for the jury. In the recording, the Defendant told the dispatcher that he and the victim, whom he called his girlfriend, "got into a big fight," that the victim tried to stab him, and that he took the knife from her and stabbed her in self-defense. The Defendant said his girlfriend needed an ambulance because she could not move. He said the stabbing occurred at 2:00 a.m. He said that the victim was conscious and breathing and that the victim had "serious bleeding everywhere." He told the dispatcher that the victim had been stabbed in the stomach, back, chest, and hands. He said the knife was in the kitchen sink. The Defendant stated that he had been stabbed in the arm and fingers and that he put a Band-Aid on his wounds. The victim was heard in the background talking and the Defendant told the dispatcher that the victim was talking to her mother on the telephone. The Defendant stayed on the phone until he saw the police officers.

Nashville Fire Department Paramedic David Hagblom testified that he responded to the victim's apartment on December 8, 2009, that the victim was in her bed, and that there was a lot of blood on and around her. He said the victim had multiple stab wounds and lacerations, difficulty breathing, an elevated heart rate, and low blood pressure. He assigned the victim's status as critical and concluded the victim had life-threatening injuries. On cross-examination, Mr. Hagblom stated that he responded to the scene with his partner. He said that the victim had "active bleeding" but that he also saw dried blood. He said he did not know if he smeared blood at the scene.

The Defendant testified that he came to Nashville for a doctor's appointment and for a meeting at the local Social Security office. He said that at the time of the attack, he and the victim were working to make their relationship "right again" and that he spoke to the victim daily while he lived in Chicago. He said their relationship lasted ten months. He said that in April 2009, he and the victim moved in together while living in Chicago and that the victim moved to Nashville on September 4, 2009.

The Defendant testified that while in Nashville, he stayed with the victim's mother and spoke to the victim on the telephone. He said that the victim picked him up and took him to her apartment, that he went to sleep, and that he awoke at 2:00 a.m. to go to the bus station. He agreed they slept in separate bedrooms. He said he and the victim talked about

their relationship and decided to attempt to reconcile. He said the victim wanted to work things out but also hesitated. He said the victim thought he returned to Chicago to be with his former wife, which he denied. He said the victim "meant the world" to him and that he would have died for her.

The Defendant testified that he called the bus station to determine the departure time of the bus to Chicago, and that while he was on the phone, he asked the victim if they were going to reconcile. He said the victim grabbed her phone, ran into her bedroom, grabbed a box cutter, and cut his arm. He said that one minute the victim was happy and that the next minute she was angry. He said he received a text message, and the victim became angry because she thought it was from his former wife. He said the victim became violent and cut his wrist. He said he grabbed the victim, who told him she was pregnant. He said he went into another room looking for proof that the victim was pregnant. He said that when he returned to the living area, the victim cut him again on his wrist. He said he "got a chance to get the other razor" from the victim and threw it. He said the victim picked up a knife lying on the kitchen table and cut his finger. He said he took the knife from the victim and stabbed her. He said he flew into a "big rage" and recalled wrestling with the victim on the floor. He said the victim was hit in the head with something, stood up, "came at [him]" again, and said, "[B]----, you stabbed me." He said his stabbing the victim was his reaction to being stabbed by the victim.

The Defendant testified that the victim came at him again and that he stabbed the victim. He said that from 3:00 to 8:00 that morning, he and the victim were exhausted and lay on the floor. He said he was able to get up and enter the bathroom. He stated that he washed his hands in the sink and that the victim told him where to find Band-Aids. He said he went into the kitchen, saw the blood, and fought with the victim again. He said that he and the victim talked for a few minutes and that he took a bath while the victim was on the floor. He said the victim stood up on her own and entered her bedroom. He admitted cleaning the blood in the apartment at the victim's request and said he called his family to tell them what happened. He said that the victim asked for medicine, that he gave the victim medicine, and that he called the police around 8:00 a.m. He said he waited to call the police because he was scared and did not know what to do. He said his relationships with his former wife and with the mother of his child involved domestic violence, but he denied causing them physical injuries. He admitted to violating previous orders of protection and to being arrested for domestic violence.

The Defendant testified that the victim was not helpless and that she had an opportunity to leave the apartment when he took a bath. He said the victim also had an opportunity to leave the apartment when he left the living area to look for proof of the victim's pregnancy. He said there were cell phones on the kitchen table. He admitted,

though, he also had an opportunity to leave the apartment. Although he said the apartment was their apartment, he admitted he was not named in the lease and did not work for Public Storage. He said that they lived together before he left for Chicago and that he was only gone for one month. He denied returning to Chicago because his relationship with the victim ended but admitted they needed to reconcile. He said their relationship was "iffy."

The Defendant testified that he threw away the victim's clothing, the broken glass, and the broken statuette. He denied throwing away the bleach bottle. He denied giving the box cutter back to the victim after he took it from her and said she had another box cutter in her bedroom. He said the victim asked to have sexual relations with him between the victim's cutting him with the box cutter and the victim's cutting him with a knife. He identified photographs of his injuries, which showed cuts to his left wrist and right pinky finger and scratches to his right cheek. The Defendant said that the markings on his face were "slashes" and that they were caused by a knife, although the wounds were not open or bleeding. He said that he was left-handed but that he had been writing with his right hand while in court for the trial.

The Defendant testified that he was diagnosed with depression and grand mal seizures. He said his seizures caused him to "blank out at any time" without medication. He said that the doctor he saw in Nashville before the attack put him "back on" Celexa and that he took his first dose the night of the attack. He admitted wrongdoing and said he and the victim were both victims. He denied trying to kill the victim.

On cross-examination, the Defendant testified that he caused all the victim's wounds, that the fight lasted six hours, that he knew the victim could not help herself, and that he knew he stabbed the victim in the back, chest, stomach, and hands. He said he was "fully awake" during the struggle but denied being himself because of his anger. He said that in the beginning, he only tried to defend himself from the victim's stabbing him. He agreed that he received three cuts during the struggle and that the victim received twenty-five stab wounds. He believed he acted in self-defense but said "it went out of hand that night."

Dr. James Walker, an expert in neuropsychology, testified that the Defendant had a history of seizures that were not controlled by medication and caused him to lose mental functions. He said the Defendant also had a history of cognitive limitations. He said the Defendant had difficulty thinking, reasoning, remembering, and learning new information. He said the Defendant did poorly in school and attended special education classes.

Dr. Walker testified that initially the Defendant tried to present himself as having more serious memory problems than he had. He said he told the Defendant that the test results would be useless if he did not provide honest answers. He believed the Defendant

gave truthful answers from that point forward. He concluded that the Defendant had "significant problems" thinking and reasoning. He said the Defendant had an IQ of sixty-seven, which meant the Defendant was "mentally retarded."[1] He concluded that the Defendant's brain was not able to process information well, that he was not able to use language effectively, and that he was not able to solve non-verbal problems effectively. He said the Defendant had a third grade reading level.

Dr. Walker testified that the Defendant reported having many symptoms associated with mental illness, including being paranoid with regard to other people's intentions, being anxious and tense, having periods of panic, fear, and an increased heart rate, having mood swings, and being depressed. With regard to the Defendant's personality, Dr. Walker said the Defendant reported having a chronic sense of emptiness, frequent mood swings, and an intense attachment to other people. He said the Defendant reported previous suicide attempts, which were verified by medical records, that occurred during relationship problems. He diagnosed the Defendant with somatoform disorder because rather than expressing his emotions, the Defendant complained of physical aliments such as a stomach ache. He diagnosed the Defendant with borderline personality disorder.

Dr. Walker testified that his diagnoses led him to conclude that at the time of the attack, the Defendant was incapable of premeditation or acting with reflection and judgment. He said that when someone with borderline personality disorder faced the loss of a "primary relationship," the person "by definition" acted irrational, unreflective, and non-judgmental. He said the fear of the loss caused the person to act with rage.

On cross-examination, Dr. Walker testified that at the time of his testimony, the Defendant was capable of premeditation. He agreed that responding to the loss of a relationship with anger and rage was not uncommon and that being angry did not prevent premeditation. He said, though, that persons with borderline personality disorder reacted in extreme fashion. He said that the Defendant would react with rage, anger, terror, or fear at the loss of every relationship.

Dr. Walker testified that although the attack stopped and began several times over the course of six hours, he believed the Defendant was under extreme stress that prevented him from acting in a rational manner. He agreed that the Defendant probably panicked when he cleaned the blood from the apartment and that someone could panic without having a mental disease or defect. He agreed that someone could get angry without having a mental illness.

---

[1] We note that on April 9, 2010, the General Assembly ordered all references to "mental retardation" in Tennessee Code Annotated to be changed to "intellectual disability." See 2010 Tenn. Pub. Acts 734. The testimony of the witnesses is provided as given.

-10-

He agreed that his conclusions were based on his belief that the Defendant and the victim argued before the attack began and said that if they did not argue, he was mistaken. He said the victim's ending the relationship was going to produce a "bad response" from the Defendant, but not necessarily a violent response.

Dr. Walker testified that the Defendant stated that he did not recall stabbing the victim after inflicting the first stab wound, that he "blanked out," and that he awoke on the floor. He said, though, that he did not believe the Defendant's story and agreed that he did not know what happened between the Defendant and the victim. He agreed he did not know if the Defendant and the victim had contact after the victim left Chicago. He said, though, that for people with borderline personality disorders, relationships never ended. He said that the Defendant's calling his family members after the attack and cleaning the apartment was bizarre and agreed that cleaning the apartment, taking a bath, and placing his clothes in a bag took a degree of thought and reflection.

Upon this evidence, the jury convicted the Defendant of especially aggravated kidnapping but was unable to reach a verdict on attempt to commit first degree murder and tampering with evidence. The trial court sentenced the Defendant to twenty-five years at 100% service as a violent offender. This appeal followed.

# I

The Defendant contends that the evidence is insufficient to sustain his conviction. He argues there is no evidence showing he kidnapped the victim. The State responds that because the Defendant was not convicted of any accompanying felony and because his conduct satisfied the elements of the statute, the issue is without merit. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S .W.2d 651, 659 (Tenn. 1997).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

Especially aggravated kidnapping is defined as false imprisonment where the victim suffers serious bodily injury. T.C.A. § 39-13-305 (2010). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Id. § 39-13-302 (2010). Serious bodily injury is defined, in part, as a substantial risk of death, protracted unconsciousness, extreme physical pain, protracted or obvious disfigurement, or a protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty. Id. § 39-11-106(a)(34)(A)-(E) (2010).

Viewed in the light most favorable to the State, the record reflects that the Defendant struck the victim in the head with several items from the victim's apartment, causing her to fall and be dazed. The Defendant stabbed the victim in the back twice, and although she tried to get away from the Defendant, he prevented her from doing so. The Defendant took the victim's cell phone and stood over her while stabbing her, which prevented her from leaving the apartment or calling the authorities. The Defendant stabbed the victim in the stomach, chest, collar bone, neck, breasts, and hands multiple times. The victim's lung, kidney, and bladder were pierced during the stabbing, and she was unable to defend herself. The Defendant told the 9-1-1 dispatcher that the victim could not move and admitted during his testimony that the victim could not help herself. The victim asked the Defendant to call an ambulance and her mother multiple times, but the Defendant called the bus station and various family members instead. The Defendant removed the victim's clothing, dragged her into her bedroom, and put the victim into bed where she stayed until paramedics arrived. The attack spanned six hours. The victim testified about her injuries, including her permanent scars, her constant back pain, and her inability to lift more than three pounds with her right hand. The evidence is sufficient to support the conviction.

The Defendant also argues pursuant to State v. Richardson, 251 S.W.3d 438 (Tenn. 2008), State v. Anthony, 817 S.W.2d 299, 305 (Tenn. 1991), and State v. Dixon, 957 S.W.2d 532, 534-35 (Tenn. 1997), that the confinement of the victim was incidental to the attempt to commit murder charge, rendering the evidence insufficient to support his conviction. Our

supreme court, though, overruled Anthony, concluding that "[t]he separate due process test articulated . . . in Anthony, and subsequently refined in Dixon and its progeny, is . . . no longer necessary to the appellate review of a kidnapping conviction accompanied by a separate felony." State v. White, 362 S.W.3d 559, 578 (Tenn. 2012). In White, the court concluded that the Tennessee General Assembly did not intend for the kidnapping statutes to apply when the confinement or removal was incidental to an accompanying felony. Id. at 562. The court stated that a "separate due process" analysis was "no longer necessary to the appellate review of a kidnapping conviction accompanied by a separate felony." Id. at 578. As a result, the court stated that a jury's finding beyond a reasonable doubt all the elements of kidnapping in conjunction with the appellate court's "task . . . of assessing the sufficiency of the convicting evidence" sufficiently protects a defendant's due process rights. Id.

Our supreme court also concluded that to protect a defendant's due process rights, jury instructions "should be designed to effectuate the intent of the General Assembly to criminalize only those instances in which the removal or confinement . . . is independently significant from an accompanying felony. . . ." Id. The court stated that "trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or . . . is significant enough, standing alone to support the conviction." Id. The court noted that although this issue was formerly analyzed as a due process issue under Anthony and its progeny, the issue is now analyzed as a factual issue determined by a jury after receiving a proper instruction. Id.

Although the trial court discussed the elements of especially aggravated kidnapping during the jury instructions, the jury was not provided the required instruction under White, and we conclude that the failure was error. In determining whether the error is harmless beyond a reasonable doubt, this court must evaluate "the harmful effect of the trial court's failure to instruct the jury that the 'key element - the substantial interference with the victim's liberty - [requires] a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense.'" State v. Bennie Osby, No. W2012-00408-CCA-R3-CD, slip op. 12 (Tenn. Crim. App. Nov. 2, 2012) (quoting White, 362 S.W.3d at 580).

We conclude that the trial court's failure to provide the jury the proper instruction under White was harmless error beyond a reasonable doubt. In contrast to the defendants in White, Anthony, Dixon, and Richardson, the Defendant was acquitted of the accompanying felonies and only convicted of especially aggravated kidnapping. The jury's verdicts show that it found the Defendant's confinement of the victim was "independently significant" from the two accompanying felonies in which the Defendant was acquitted. We agree with the jury's finding and conclude that the verdict would have been the same had the court provided the proper instruction. The Defendant is not entitled to relief.

## II

The Defendant contends that the prosecutor engaged in three instances of improper conduct. He contends that the prosecutor improperly questioned Paramedic David Hagblom about his interaction with the Defendant and failed to disclose information about the interaction to counsel. He argues that the prosecutor's failure to disclose Mr. Hagblom's interaction with the Defendant violated Tennessee Rule of Criminal Procedure 16(A)(1)(a). The State responds that because Mr. Hagblom did not speak with the Defendant, there was nothing to disclose.

Mr. Hagblom testified that after he arrived at the scene, his focus was on the victim. The prosecutor asked Mr. Hagblom if he spoke to the Defendant. Mr. Hagblom said that he did not recall talking to the Defendant and that he did not focus on the Defendant.

We note the Defendant failed to make a contemporaneous objection to the prosecutor's line of questioning at the trial. See T.R.A.P. 36(a); Tenn. R. Evid. 103(a)(1). In any event, although Rule 16(A)(1)(a) requires the State to disclose the Defendant's oral statements to law enforcement made before or after his arrest when the State intends to offer the statement as evidence, we conclude that the rule did not apply and that the prosecutor's questioning was not improper. Mr. Hagblom did not speak to the Defendant or interact with him in any fashion, and the Defendant did not speak to Mr. Hagblom. As a result, the State had nothing to disclose to the Defendant.

The Defendant also contends that the prosecutor improperly failed to provide him with a witness list. The State provided counsel with the witness list at 7:15 p.m. the night before the trial. He argues the State should have been limited to the witnesses named in the indictment. The State responds that the Defendant has failed to show he was prejudiced by his late receipt of the witness list.

The State is required to list on the indictment the "names of the witnesses as [it] intends shall be summoned in the cause." T.C.A. § 40-17-106 (2012). The purpose behind this statute is "to prevent surprise to the defendant at trial and to permit the defendant to prepare his or her defense to the indictment." State v. Allen, 976 S.W.2d 661, 667 (Tenn. Crim. App. 1997). This court has concluded, though, that the duty is not mandatory. Id. (citing State v. Harris, 839 S.W.2d 54, 69 (Tenn. 1992). A defendant is entitled to relief for the State's failure to disclose witness names by showing "prejudice, bad faith, or undue advantage." Id.

The Defendant only provides the facts underlying his receipt of the witness list and his argument that he is entitled to appellate relief due to the late receipt. He fails to cite any legal authority. The indictment named Officers Sharraff Mallary and Brent Fisher and the victim as witnesses. At the hearing on the motion for a new trial, the prosecutor explained,

> [T]he State had substantial issues in this case . . . one of the police officers was dismissed from the police department. The State was attempting to call witnesses who would fill in those areas, and we were working trying to get those people in place. . . . We did our best to give notice of who might be involved in the case. We . . . sent all the information we could . . . on April 6th as regards to any of the fire fighters and paramedics who were involved. . . . I had given that information to [defense counsel]. We made every attempt – we responded to discovery and turned over our information in discovery . . . [and] offered open file discovery.

The trial was held on April 11-12, 2011. The prosecutor stated that if counsel wanted to view any of the information in the State's file, he would have shared the information and made it available to counsel. He said he asked counsel if she believed there was information that was not provided to her. The trial court concluded that the Defendant was not prejudiced by the State's delay in providing him the witness list.

We conclude that the Defendant has failed to establish prejudice from the State's delay in providing counsel with the witness list. The prosecutor explained that his inability to provide the Defendant a witness list stemmed from the dismissal of an investigating police officer and his need to locate other officers who could testify at the trial. The prosecutor, though, had an open file policy and discussed with counsel sharing his file if counsel believed there was information not provided to her. We cannot conclude that the Defendant suffered prejudice, that the prosecutor engaged in bad faith, or that the prosecutor withheld the witness list to obtain an undue advantage.

The Defendant contends that the prosecutor improperly questioned Dr. James Walker about the source of payment for his evaluating the Defendant. We note the Defendant waived this issue by failing to make contemporaneous objections at the trial and by failing to include the issue in his motion for a new trial. See T.R.A.P. 36(a); Tenn. R. Evid. 103(a)(1). The Defendant concedes waiver of the issue and asks us to consider it in the interests of justice as plain error. See T.R.A.P. 36(b). He argues the prosecutor's questions inflamed or attempted to inflame the passions or prejudices of the jury under State v. Goltz,

-15-

111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003). The State responds that plain error does not exist because a clear and unequivocal rule of law was not breached.

> Our supreme court has adopted the factors developed by this court to be considered
>
> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The record must establish all five factors before plain error will be recognized and "complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

At the trial, the prosecutor questioned Dr. Walker about his receiving payment from the Administrative Office of the Courts for evaluating the Defendant and testifying at the trial. Dr. Walker admitted he did not know the Defendant until counsel hired him for the evaluation. When asked if the court ordered the Defendant's evaluation, Dr. Walker said the court approved the evaluation.

Tennessee Rule of Evidence 616 states, "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Our supreme court has concluded that under Rule 616, a prosecutor's questioning a defendant's expert witness about his fees is proper. See State v. Bush, 942 S.W.2d 489, 518 (Tenn. 1997). We conclude that the prosecutor's questions regarding payment for Dr. Walker's services were not improper and that the Defendant has failed to establish that a clear and unequivocal rule of law was breached.

### III

The Defendant contends that the trial court improperly weighed the applied mitigating factor, that the trial court applied an inappropriate enhancement factor, and that his sentence

is excessive. The State responds that the trial court made the appropriate findings and properly sentenced the Defendant. We agree with the State.

Previously, this court's review of the length of a sentence was de novo with a presumption of correctness. T.C.A. §§ 40-35-401(d), -402(d) (2010). Recently, though, the Tennessee Supreme Court adopted a new standard of review for sentencing in State v. Susan Renee Bise, — S.W.3d —, —, No. E2011-00005-SC-R11-CD, slip op. at 29 (Tenn. Sept. 26, 2012). Currently, length of sentence "within the appropriate statutory range [is] to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" Id. slip op. at 30.

In determining the proper sentence, the trial court must consider: (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991); State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986).

In imposing a sentence within the appropriate range of punishment for the defendant:

[T]he court shall consider, but is not bound by, the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c)(1)-(2) (2010). From this, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008) (quoting T.C.A. § 40-35-210(d)). "[A] presumption of reasonableness should

be afforded to a sentence within the appropriate statutory range." Susan Renee Bise, slip op. at 29.

At the sentencing hearing, the victim testified that as a result of the attack, she had permanent scars on her head and had a punctured lung, bladder, and kidney. She said that she required reconstructive surgery on her right hand and that she could not lift anything heavier than three pounds. She said she also received stab wounds to her stomach and back. She said she continued to feel pain in her back, although she completed her rehabilitation therapy. She underwent counseling twice.

The victim testified that she and her family continued to live through the "ordeal," that the Defendant contacted her and her family members after the attack, and that the Defendant's cases pending at the time of the sentencing hearing were the result of that contact. She told the judge to sentence the Defendant to what the court believed appropriate. She agreed the Defendant's being in confinement made her feel safe and said she had concerns for her safety if the Defendant were released.

On cross-examination, the victim testified that Joshua Carter was a friend, that Mr. Catrer was incarcerated, and that she talked to him while he was in custody. She denied asking Mr. Carter to attack the Defendant while in jail and denied knowing that the Defendant stood beside Mr. Carter while he was speaking to her on the phone.

Upon examination by the court, the victim testified that she obtained several orders of protection against the Defendant after he began contacting her and her family while in custody and that the final order's duration was ten years. She said the Defendant contacted her by telephone and mail about ten times after she obtained the order of protection. She said that in the letter, the Defendant apologized and offered her money. She gave the letter to the prosecutor. She said that she talked to the Defendant twice on the phone and that he apologized. She said the Defendant last contacted her five months before her testimony. The court order suspending the Defendant's telephone privileges was received as an exhibit.

The presentence report and Dr. Walker's evaluation report were received as exhibits. The presentence report showed the Defendant had one previous theft conviction. The Defendant had an eleventh grade education. Dr. Walker's report showed diagnoses for bipolar disorder, somatoform disorder, and borderline personality disorder.

Sherri Gray testified for the defense that she met the Defendant through a mutual friend who was incarcerated, that she and the Defendant were dating and wrote to each other, and that she knew the nature of the Defendant's conviction. She said that although the Defendant "had issues," he was a caring person. She denied the Defendant's being violent

-18-

with her and said he was respectful and honest. She said she planned to continue her relationship with the Defendant even if the trial court sentenced him to confinement.

Upon examination by the trial court, Ms. Gray testified that she talked to the Defendant on the phone until he lost his privileges and that she visited him when her schedule allowed. She denied having contact with the Defendant outside confinement. She agreed she did not have "contact visits" with the Defendant. On cross-examination, she stated that she did not attempt to contact the victim, that she had no reason to contact her, and that she did not have animosity toward the victim.

The trial court noted its consideration of the relevant statutory and other factors. With regard to mitigation, the trial court acknowledged that the Defendant had mental health issues but found that whether his mental health reduced his culpability was not "borne out by the facts." The court found mitigating factor (8) applied but did not give it much weight. See T.C.A. § 40-35-113(8) (2010) ("The defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense").

Although the court found that enhancement factor (1) applied, it did not "give much weight to it." See T.C.A. § 40-35-114(1) (2010) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"). It found enhancement factor (5) applied after considering the nature of the victim's wounds, the Defendant's telling the victim to die during the attack, and the victim's begging the Defendant to allow her to say goodbye to her mother. See T.C.A. § 40-35-114(5) (2010) ("The defendant treated, or allowed to be treated, with exceptional cruelty during the commission of the offense"). The court found enhancement factor (9) applied. See T.C.A. § 40-35-114(9) (2010) ("The defendant possessed or employed a . . . deadly weapon during the commission of the offense"). The court relied heavily upon factors (5) and (9).

In sentencing the Defendant to twenty-five years' confinement, the court noted the "extreme" violence, torture, and abuse that lasted for several hours. The court stated that the Defendant's telling the victim to die and telling his family he had already killed the victim while in the victim's presence was torture and abuse beyond what was inherent in the offense.

With regard to the Defendant's argument that the trial court improperly weighed the mitigating factor it applied, this court may not reweigh enhancement and mitigating factors relied upon by the trial court. Carter, 254 S.W.3d at 344-45. In any event, the court followed the statutory sentencing procedure, made factual findings supported by the record, and considered the principles relevant to sentencing. The court also stated that it had considered

the trial evidence in reaching its sentencing determination and acknowledged that the Defendant had mental health problems in determining the Defendant's sentence.

With regard to the Defendant's argument that the trial court erroneously applied enhancement factor (1), the record shows that the Defendant pleaded guilty to theft in 2004 and served seventeen days in confinement. The trial court noted the Defendant's contacting the victim after his arrest in violation of an order of protection. Although the court did not rely heavily on this factor, we note that misapplication of an enhancement factor "does not invalidate the sentence unless the . . . court wholly departed" from the sentencing act and its amendments. Susan Renee Bise, slip op. at 28. In any event, we conclude that factor (1) was properly applied and that the record supports the twenty-five year sentence.

With regard to the Defendant's argument that his twenty-five year sentence is excessive, a presumption of reasonableness is afforded to a sentence "within the appropriate statutory range." Id. The record shows that the trial court considered the appropriate sentencing factors and supports the trial court's significant reliance on the two enhancement factors applied. As a Range I, standard offender convicted of a Class A felony, the Defendant faced a sentence of fifteen to twenty-five years. Given the nature of the victim's wounds, the Defendant's use of a knife during the offense, his telling the victim to die, his refusing to call for medical assistance, his refusing to allow the victim to talk to her mother when she thought she was dying, and his telling his family that he had killed the victim while the victim was present, the record supports the Defendant's sentence. We conclude that the Defendant has not shown an abuse of discretion and is not entitled to relief.

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE